UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| NICOLETTE WISEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO:   3:09-CV-00583-JD |
| | ) | |
| AUTOZONE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On December 17, 2009, Nicolette Wiseman filed a complaint in this court against AutoZone, Inc., her former employer. [DE 1]. She brought four claims: Count I, sexual harassment and discrimination; Count II, retaliation; Count III, pregnancy discrimination, and Count IV, negligence. AutoZone answered on January 27, 2010, and amended its answer on March 26, 2010. [DE 6; DE 15]. On January 21, 2011, AutoZone moved for summary judgment on all four counts. [DE 21]. Wiseman responded, AutoZone replied, and the motion is ready for a ruling. [DE 24; DE 26]. For the reasons stated herein, summary judgment is **DENIED** with respect to Count I and Count II, but **GRANTED** with respect to Count III. Count IV is **DISMISSED** with prejudice.

### I.  STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001).  A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and

summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Still, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings.  It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

## II.  FACTUAL BACKGROUND[1]

The court has chosen to provide both "versions" of some contested facts in light of the special significance factual disputes acquire in the summary judgment context. The inclusion of a certain version of a disputed fact in this section does not, however, suggest that the court relied on that version in reaching its conclusions. When ruling on a motion for summary judgment, the court construes all facts in the light most favorable to the non-movant. Here, that means the Plaintiff, and

---

[1] The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"]. No internal page or line numbers will be referenced.

all reasonable and justifiable inferences are drawn in her favor. *Anderson*, 477 U.S. at 255. Furthermore, the court considers only evidence which would be admissible at trial. Questions of admissibility have been raised with respect to some of the evidence presented in this section, but those question will be dealt with when the court discusses the issues. In short, this section is simply intended to provide a comprehensive background of the evidence presented to the court.

## The Parties

Plaintiff Nicolette Wiseman was hired as a commercial driver at AutoZone, Inc.'s LaPorte, Indiana location in the summer of 2007. [DE 23-2 at 8]. Her duties in that capacity included answering the phone, taking commercial orders, and delivering parts to local automotive repair shops, but she also shared responsibility for more general tasks like store maintenance, unpacking parts trucks on Thursdays, and helping at the counter. [DE 23-1 at 2-3; DE 23-6]. Commercial specialist Randy Cunningham was her immediate supervisor. [DE 23-1 at 9; DE 23-3 at 2]. Store manager Lucas Gard supervised Randy Cunningham. [DE 23-1 at 9]. Gard reported to AutoZone, Inc.'s district manager, Gary Bailey. [DE 23-1 at 9, DE 23-4 ¶ 3]. Bailey was personally present at the LaPorte store every week or two on average, and Wiseman and he were acquainted. [DE 23-1 at 9-11; DE 23-4 ¶ 3].

## AutoZone Company Policies

AutoZone presents selections from an AutoZone company handbook that contain, *inter alia*, an attendance policy, problem-solving procedure, and a statement of AutoZone's commitment to providing a workplace that is respectful and free of all harassment. [DE 23-5]. In particular, the handbook provides the following:

> Harassment occurs when unwelcome conduct, including but not limited to, sexual
> or racial harassment and intimidation, creates a hostile or offensive environment or

is implied to be a factor in employment or advancement decisions.

AutoZone does not tolerate sexual harassment or harassment of any nature. This includes actions, comments, inappropriate physical contact, sexual advances or any other contact that is intimidating or otherwise offensive or hostile. Such conduct, or encouraging or condoning such conduct, may result in immediate termination.

[DE 23-5 at 6]. The handbook also contains the following policy for "job abandonment":

If an AutoZoner fails to call in or report to work for 2 consecutive days, AutoZone assumes the AutoZoner has abandoned the job, and the AutoZoner's employment is automatically terminated.

[DE 23-5 at 3]. It is unclear whether the provisions in this handbook bore any functional weight when Wiseman was employed at the LaPorte store. While Wiseman remembers receiving a copy of the handbook at the outset of her employment [DE 23-1 at 6], store manager Gard testified that he did not recognize the handbook presented to the court, and stated in very certain terms that it was not in place during the time when both he and Wiseman worked at AutoZone. [DE 25-5 at 4 ("This is not the proper handbook.")]. The handbook is copyrighted for 2004-2009, but bears no independent indication of the year it was produced, used, or distributed. [DE 23-5].

In any case, with respect to attendance policy at the LaPorte store, Gard did not follow any handbook at all. He preferred to use his own system. [DE 25-5 at 2]. Gard would accept any sort of doctor's note to justify an absence for medical reasons. [DE 25-5 at 2]. Ongoing medical restrictions, however, needed to be substantiated by an AutoZoner Physician's Report. [DE 25-5 at 2, 5]. There was no "points" system for attendance violations in place during Wiseman's tenure, and Gard recalled no rule, like the one in the handbook, concerning set numbers of absences that would trigger a written warning, a suspension, or a termination. [DE 25-5 at 3-4]. Gard's superiors - including district manager Gary Bailey - simply told him to use his discretion, as long as it was

exercised consistently. [DE 25-5 at 5]. Gard recalls instances where he accommodated medical restrictions for employees who submitted the proper paperwork. [DE 25-5 at 5].

## Wiseman as an Employee

Wiseman was a mostly competent commercial delivery driver. [DE 25-12 at 2; DE 23-2 at 17]. Her immediate supervisor, Cunningham, characterizes her performance as "fine," although he received some complaints about her ability to look up parts. [DE 25-12 at 2]. Gard, the store manager, had no complaints whatsoever, and describes Wiseman as having a good work record. [DE 23-2 at 17; DE 25-8 at 2]. In early February 2008, after several months at AutoZone, Wiseman learned she was pregnant. [DE 23-1 at 24]. Wiseman provided a certificate of pregnancy to her employer shortly thereafter, but she noticed no change in coworkers' behavior toward her between the time she made AutoZone aware of her pregnancy and March 11, 2008, when the sexual harassment forming the primary basis for this lawsuit occurred. [DE 23-1 at 109-114; DE 25-4 at 7].

## Sexual Harassment

On March 11, 2008, Wiseman drove three separate delivery trips to Jim Shaw's automotive repair shop, a regular commercial customer. [DE 23-1 at 20, 22, 25, 27]. On the first visit, Wiseman told Shaw's female secretarial employee, Pat, that she was hypoglycemic and had not eaten that day because she was short on money. [DE 23-1 at 22-23]. Pat knew Wiseman was pregnant and provided her with a snack. [DE 23-1 at 22-23]. Wiseman did not encounter Jim Shaw, the proprietor of the establishment, on her first visit, but she did when she went back midmorning. [DE 23-1 at 24]. Pat had informed Shaw of Wiseman's situation, and he handed Wiseman twenty dollars to buy food. [DE 23-1 at 65-66].

5

Wiseman returned to Shaw's for a third delivery later that afternoon. [DE 23-1 at 29]. This time, Shaw was waiting at the door when Wiseman arrived. [DE 23-1 at 30]. Pat was not present, and nobody else was in the shop. [DE 23-1 at 30-31]. Shaw shut and locked the main door behind Wiseman as she entered. He told her he wanted to "show her something," and led her through the shop into a small room, shutting that door behind them as well. [DE 23-1 at 31-32]. Wiseman had her hands full with a delivery acknowledgment and the part Shaw had ordered, and by this time she had grown uncomfortable and apprehensive. [DE 23-1 at 31-32]. Shaw approached Wiseman, lifted up her shirt from the bottom, moved her bra, and started kissing her breasts. [DE 23-1 at 33-37; 118]. Wiseman, distressed, pushed Shaw away and hurried out of his shop. [DE 23-1 at 36-37].

Wiseman returned to AutoZone and told her supervisors what had happened. [DE 23-1 at 37-39]. Cunningham, Gard, and district manager Gary Bailey were all on site that day, and each was informed of Shaw's actions. Someone in the group suggested, and all agreed, that they would not send Wiseman to Shaw's anymore. [DE 23-1 at 21, 38]. She told her supervisors that she wanted to make a police report, but her supervisors told her not to, remarking, "Oh, it's probably not necessary." [DE 23-1 at 38]. Gard and Cunningham told Wiseman, "Well, it isn't going to do you any good because you're not going to get anywhere with it." [DE 25-1 at 4].

### Wiseman Learns Shaw Was a Repeat Offender

As the conversation continued, Wiseman learned some startling new information. Gard exclaimed to Cunningham that Shaw had done "the same thing" to Ms. Wiseman that he did to a woman named Shari Driggers. [DE 25-1 at 4-5]. Shari Driggers was Wiseman's predecessor in the commercial driver position at the LaPorte AutoZone, and she had indeed encountered similar, though arguably less egregious, aggression from Shaw.

6

Driggers found Shaw to be "touchy-feely," and unable to keep his hands to himself. [DE 25-8 at 5]. On multiple occasions, Shaw made uncomfortable physical contact with Driggers, including touching her on the waist, grabbing her buttocks, and kissing her under the guise of coming close to whisper something. [DE 25-8 at 5]. It is undisputed that Driggers told her AutoZone supervisors - Cunningham, and later Gard - that Shaw made her uncomfortable, but there is some dispute over the level of detail with which she described his inappropriate behavior. [DE 25-8 at 5; DE 23-2 at 9; DE 23-3 at 4]. Cunningham remembers Driggers complaining about Shaw trying to hug her on multiple occasions. [DE 23-3 at 4]. Gard, who was hired as the LaPorte store manager while Driggers was still employed, only remembers Driggers telling him that Shaw was touchy-feely and wanted to hug her every time she delivered to his shop. [DE 23-2 at 9]. Driggers, for her part, later told a police officer investigating Wiseman's claim that her AutoZone superiors were "aware of the situations that had occurred." [DE 25-8 at 5]. In any case, Driggers suggested a solution: she would only deliver to Shaw's when his female secretarial employee, Pat, was present. Her supervisors accepted it. [DE 23-3 at 5]. AutoZone would not require Driggers to deliver to Shaw's at any time she did not wish to do so. [DE 23-3 at 5].

Driggers' makeshift moratorium on one-on-one interaction with Shaw solved her problem, but nobody ever suggested it to Wiseman. Cunningham believes he told Wiseman at the outset of her employment that she would not have to deliver to Shaw's shop if she was uncomfortable. [DE 25-12 at 2]. Wiseman remembers things differently: she testified at her deposition that nobody told her anything about Shaw at all. [DE 25-1 at 5-6]. In any case, it is undisputed that nobody ever told her about what Shaw had done to Shari Driggers. Naturally, then, when Gard mentioned it to Cunningham during the group's March 11th conversation, Wiseman demanded an explanation. [DE

7

25-1 at 5]. Gard, sparing the details once again, told her that Shaw had done the "same kind of thing" to Driggers. Cunningham questioned whether they ever should have sent Wiseman to Shaw's, and Wiseman wondered out loud why they did. [DE 25-1 at 5-6]. She told her supervisors that, had she known a previous driver had problems with Shaw, she would have flatly refused to deliver to his shop. [DE 25-1 at 6].

### Immediate Aftermath

The March 11th conversation concluded after 15-20 minutes because Wiseman had to do another delivery, this time to Main Muffler. Still flustered, Wiseman told two employees at Main Muffler what had occurred and asked for advice. [DE 25-1 at 6]. The next day, Wiseman did the same thing on deliveries to two additional commercial customers, Apex and Cannon's. [23-1 at 52-53; DE 25-1 at 7-8]. At some point, Wiseman may have also discussed the incident with employees at Anderson Automotive and Pine Lake Auto Service. [DE 23-8]. Employees at each of these establishments encouraged Wiseman to go to the police, as did her family, and she was eventually convinced. [DE 25-1 at 8].

On March 13th, 2008, Wiseman told Cunningham and Gard she was going to turn Shaw in to the police. Gard told her, "Well, you're going to have to clock out and do it on your own time." [DE 25-1 at 8; DE 25-2 at 1]. Cunningham, for his part, expressed chagrin at the potential economic repercussions: "Oh, great, we're probably going to lose a commercial client." [DE 25-1 at 8; DE 25-2 at 1]. Wiseman filed a police report anyway.

On or about March 18th, 2008, Mark Reaves, a representative from AutoZone's human resources department, interviewed Wiseman about the incident with Shaw. [DE 23-1 at 49-51]. Reaves and Wiseman filled out a written question and answer summarizing the incident and her

interactions with customers as previously stated, and Wiseman signed off on it. [DE 23-8]. This was the last interaction between AutoZone and Wiseman regarding the Shaw incident. Wiseman was never required to deliver to Shaw again, and AutoZone did eventually drop Shaw as a commercial client. [DE 23-1 at 21; DE 23-2 at 13].

Around two weeks after the incident with Shaw, and after Wiseman filed a police report and met with Mark Reaves, she was moved from her commercial driver position to a position behind the counter on the sales floor. [DE 23-1 at 47]. Wiseman questioned her supervisors about why she had been moved, but Gard and Cunningham repeatedly referred her back to each other. [DE 23-1 at 47-48]. Eventually, Wiseman was able to extract a straight answer: she was moved because she had discussed Shaw's harassment with several commercial customers, and they had complained. [DE 23-1 at 46-47; DE 23-3 at 11-12]. According to her supervisors, at least one customer asked that Wiseman not deliver to their account anymore, and Cunningham, Gard and Bailey decided it would be best for Wiseman to work the counter until they could figure out what to do about the situation.[2] [DE 23-3 at 11-12; DE 23-1 at 47; DE 23-4 ¶¶ 11-12].

Despite the position change, Wiseman's pay, benefits, terms of employment and, usually,

---

[2] AutoZone asserts that commercial customers, particularly Apex, had also complained about Wiseman showing "risqué" photographs of herself to Apex Staff. [DE 22 at 5]. AutoZone cites DE 23-3 at 12, Cunningham's deposition, for this fact, but Cunningham's testimony at the cited page is at best unclear. He mentions the complaints he received about Wiseman discussing the Shaw incident, but states that to his knowledge, no risqué photographs ever existed. He also never says that he received complaints about Wiseman sharing inappropriate or risqué photographs. Nor does district manager Bailey display any knowledge of complaints about photographs. [DE 23-4 ¶ 10]. Gard, whose deposition was not cited, *does* recall that Apex told Cunningham Wiseman had showed some "questionable" photos to them. [DE 23-2 at 17]. In any case, there is no doubt that Wiseman did show her modeling thumbnails, in which her blouse is unbuttoned about halfway, to employees at several commercial accounts [DE 23-1 at 17-19]. It is less clear whether any clients found either those photographs or her behavior regarding them objectionable and complained about it.

working hours remained the same. [DE 23-2 at 19; DE 23-4 ¶ 14]. Her duties were essentially to wait on walk-in customers and to perform other general tasks expected of each employee in a cashier/sales position. [DE 23-2 at 19]. Although Wiseman did not complain to Gard about the position change, she began to develop complaints about the work itself. [DE 23-2 at 21-22]. Simply put, Wiseman's relationship with AutoZone began to sour.

Wiseman's complaints stemmed from perceived mistreatment by supervisors that began around the time of her positional transfer. [DE 23-1 at 56-85]. Wiseman was hypoglycemic and pregnant, but while her supervisor would allow her to purchase snacks from AutoZone, he would not allow her to take a break to eat it without a medical note, telling her to get up and do her job instead. [DE 23-1 at 57]. On one "truck day" - April 8th, 2008 - Wiseman was instructed to put away a shipment of approximately 300 brake rotors, weighing 15 to 40 lbs. each. [DE 23-1 at 79-82]. Wiseman grew dizzy, started seeing spots, and decided to sit for a break only to be told to get up and get back to work. She eventually began to bleed while putting the rotors away, and had to visit her doctor, who issued lifting restrictions. [DE 23-1 at 81-82]. In addition to these discrete occurrences, Wiseman felt she was generally snubbed, yelled at, demeaned and overworked relative to other employees. [DE 23-1 at 56-85].

### Wiseman's Termination

The events that culminated in Wiseman's termination are partially contested. As mentioned, store manager Gard administered his own attendance policy. Schedules were posted each Friday, and employees were required to notify their manager at least an hour before a scheduled shift if they were going to be absent or tardy. [DE 23-2 at 2-3; DE 23-1 at 7] A computer system was in place at AutoZone to track employees' clock in and out times, and it generated automatic alerts for any

discrepancy between time scheduled and time worked. [DE 23-2 at 3-4]. Absences for illnesses were to be substantiated with a doctor's note, and ongoing medical restrictions were to be supported by an AutoZoner Physician's Report. [DE 23-2 at 4-5; DE 23-4 ¶ 19].

Wiseman began to incur frequent absences in April of 2008. AutoZone provides the following summary of Wiseman's April attendance record:

> April 4th, 2008: Wiseman failed to return after sent home for a dress code violation.
>
> April 5th, 2008: Wiseman failed to report to work claiming she had no gas.
>
> April 10th, 2008: Wiseman failed to report to work claiming she was "sore" but produced no doctor's note.
>
> April 11th, 2008: Wiseman failed to report to work and offered no reason.
>
> April 12th, 2008: Wiseman worked, but was late for her scheduled shift.
>
> April 17th, 2008: Wiseman missed her scheduled shift. She called in to report that she had medical restrictions. Gard instructed her to come into to pick up an AutoZone[r] Physician's Report for her doctor to complete. She did not do so.
>
> April 18th, 2008: Wiseman missed her shift and offered no reason. As of April 18, 2008 she still had not picked up the AutoZone[r] physician's report her doctor was to complete.

[DE 22 at 8].   AutoZone's list relies on a series of corrective action notices signed by Wiseman documenting her absences. [DE 23-10; DE 23-11; DE 23-12]. Wiseman, in turn, contests this chronology. Her brief asserts that she did call on April 11th, 2008 to report a reason for her absence: she was still sore from the April 8th brake rotor incident and had not yet seen her doctor. [DE 24 at 5]. But, the deposition page Wiseman cites pertains to her excuse for the April 17th absence, and earlier in her deposition she affirmed that she missed her April 11th shift without providing a reason. [DE 25-3 at 8].Wiseman also notes, and properly supports, that the "brake rotor incident" compelled

her to visit the doctor on April 15th, and that she brought a doctor's note to AutoZone detailing her lifting restrictions on April 16th or 17th. [DE 23-1 at 101-102; DE 23-9; DE 25-3 at 8]. Gard would not accept the note and told Wiseman to have her doctor complete an official AutoZoner Physician's Report before returning to work. [DE 23-1 at 96]. Wiseman took the form and brought it to her doctor, but her doctor was unable to complete the form until April 22nd. [DE 23-1 at 95-96; DE 23-13].

Wiseman picked up the form that day and tried to deliver it to AutoZone, to no avail. [DE 23-1 at 105-106]. She encountered AutoZone employee David Hayes, who told her Gard would call her. [*Id.*]. He did not. Later that day, Wiseman called the store. She spoke to Hayes again, who indicated she might no longer have a job. [*Id.*]. Over the coming days, Wiseman continued, repeatedly, to try to contact Gard so that she might deliver the form. [DE 23-1 at 108]. She phoned AutoZone, visited the store personally on at least four occasions, and left messages for Gard but was never able to contact him. [DE 25-9; DE 25-10]. At times, Wiseman would get a supervisor on the phone and travel to AutoZone only to find that whoever she had spoken to was suddenly no longer present. [DE 25-9 at 6]. She tried to show up for scheduled shifts only to find that the schedule had changed without her being notified. [DE 25-9 at 5-6]. On one visit to the store, AutoZone personnel kept Wiseman waiting for 20-30 minutes, only to finally inform her they would "call her when they need her." [DE 25-10 at 6]. Eventually, Wiseman assumed she was terminated and gave up. [DE 25-4 at 4-5].

Later, Gard would supposedly state that, had Wiseman requested an accommodation or time off for prenatal medical care, he would have granted it. [DE 22 at 9]. But one of the deposition pages AutoZone cites for that proposition is irrelevant, and the other does not exist in the record. Gary

Bailey, however, did state that multiple women under his chain of command became pregnant during his tenure with AutoZone, took maternity leave, and returned without incident.[DE 23-4 ¶ 18].

Wiseman filed a complaint with the Equal Employment Opportunity Commission. On August 20th, 2009, the E.E.O.C. returned a Letter of Determination stating that evidence obtained supported claims of sexual harassment, retaliation and discrimination due to her pregnancy. [DE 1-3]. On December 17, 2009, Wiseman filed this lawsuit.

### III.  DISCUSSION

AutoZone has moved for summary judgment against all four Counts of Wiseman's Complaint. For the reasons stated herein, summary judgment is denied with respect to Count I and Count II, and granted with respect to Count III. Count IV is dismissed. The court will discuss each Count separately.

### Count I: Sexual Harassment and Discrimination

Wiseman's first complaint is that she was sexually harassed in violation of Title VII. [DE 1 ¶¶ 5-13].  The court finds that genuine issues of material fact exist, which, resolved in Plaintiff's favor, would allow a reasonable jury to find that AutoZone was negligent in failing to prevent the harm that befell Wiseman. Summary judgment on this count is therefore denied.

Title VII prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1). Sexual harassment in the workplace falls within the scope of the prohibition against sex discrimination when it alters the "terms and conditions of someone's employment." *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).This occurs when sexual harassment is "either severe or pervasive

13

enough to create an abusive [or hostile] working environment." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). In order to make out a *prima facie* case, a plaintiff must show that: (1) she was subjected to unwelcome conduct of a sexual nature; (2) the conduct was directed at her because of her sex; (3) the conduct was severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009). For the purpose of this summary judgment motion, AutoZone admits that Ms. Wiseman has satisfied the first three elements. [DE 21 p. 11]. It disputes whether there is a basis for employer liability.

"Under Title VII, an employer's liability is determined by the status of the harasser and the type of injury caused by the harassment." *Erickson v. Wisconsin Dept. of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006) (citing *Ellerth*, 524 U.S. at 759). Harassment directed toward an employee by a supervisor subjects the employer to strict liability. *Id*. In contrast, when an employee is harassed by a co-worker, the employer is liable only in negligence. *Id*. The employer will be "vicariously liable" for harassment by a co-worker only if it "negligently failed to take reasonable steps to discover or remedy the harassment." *Smith v. Sheahan*, 189 F.3d at 533. It makes no difference to the court's analysis that Shaw was not actually Wiseman's co-worker. For the purpose of Title VII hostile work environment liability based on negligence, "whether the potential harasser is an employee, independent contractor, or even a customer is irrelevant[.]" *Erickson*, 469 F.3d at 605. "The genesis of inequality matters not; what *does* matter is how the employer handles the problem." *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

AutoZone argues that it cannot be liable in negligence because it took "prompt remedial action" in response to Wiseman's complaint. It protected Wiseman from further sexual harassment,

the argument continues, by not asking her to deliver to Shaw again and by eventually terminating

Shaw as a customer.[3] Rather than charge headlong into a battle over the sufficiency of AutoZone's

response, Wiseman focuses her responsive argument on a different issue: whether AutoZone's

failure to warn and protect her from a known entity who had behaved inappropriately toward a

previous female employee provides a basis for AutoZone's liability. In other words, Wiseman does

not claim that AutoZone stood idly by or responded inadequately while Shaw engaged in a pattern

of harassment against her. She claims instead that, but for AutoZone's negligence, the one severe

instance of sexual harassment to which she *was* subjected would never have occurred.

Title VII's primary objective is "not to provide redress but to avoid harm," and employers

must take "all steps necessary to prevent sexual harassment from occurring[.]" *Erickson*, 469 F.3d

at 605-6 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). An employer is negligent,

and there is a basis for liability, if it fails to take "reasonable steps to prevent harassment once

informed of a reasonable probability that it will occur." *Erickson*, 469 F.3d at 606. AutoZone's

liability under the Plaintiff's theory therefore depends on the resolution of three successive

questions. First, was there a reasonable probability of harassment? Second, if so, was AutoZone

informed of that reasonable probability? Third, if so, did AutoZone take reasonable steps to prevent

---

[3] AutoZone also discouraged Wiseman from filing a police report, however, and eventually forced her to clock out to do so. "Where . . . the employer takes action that puts a stop to the harassment, but in a way that inappropriately forces the plaintiff to bear the costs," the Plaintiff is entitled to compensation for those costs. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000). It could be argued that AutoZone's decision to handle the issue purely "in house," inasmuch as that meant discouraging a sexually harassed employee from taking entirely appropriate remedial action - and instructing her to do so off the clock if she did choose to proceed - was paramount to forcing the employee to "bear the costs," in terms of lost time and lost income, of actions taken with the intent to put an end to her harassment. The court need not decide that question, however, because Wiseman did not raise it, and because summary judgment is denied on other grounds.

15

that harassment from occurring? Because, viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could find that the answers to the first two questions are yes, and the answer to the third question is no, summary judgment must be denied.

### A.    A Reasonable Probability that Harassment Will Occur

Tailored specifically to this case, the first question becomes whether Shaw's actions towards Shari Driggers indicated a reasonable probability that a future female commercial delivery driver (Wiseman) would be harassed. This court has no trouble finding that a reasonable jury could conclude just that.  It is undisputed that Shaw behaved inappropriately and aggressively towards Shari Driggers. She told a police officer investigating Wiseman's claim that Shaw repeatedly made uncomfortable physical contact with her, including touching her on the waist, grabbing her buttocks, and kissing her, unsolicited, under the guise of coming close to whisper something.[4] Moreover, Wiseman's AutoZone supervisors themselves stated that Shaw did the "same thing" to Driggers as he did to Wiseman, clearly implying that egregious harassment had previously occurred.

In support of summary judgment, AutoZone argues that Shaw's actions toward Driggers did not indicate a reasonable probability that harassment would occur because they did not rise to the

---

[4] AutoZone characterized the police report as "hearsay" in its reply brief. [DE 26 at 3]. This statement has the ring of an objection to it, but if that was AutoZone's intent, it has failed to object properly. Local Rule 56.1(e) states: "Any dispute regarding the admissibility of evidence should be addressed in a separate motion in accordance with Local Rule 7.1." Furthermore, AutoZone's failure to raise this objection in a separate filing as required by the rule deprived Wiseman of any opportunity to respond to their objection. The court will not recognize the objection and will consider the police report as evidence. In doing so, the court notes that it may consider only admissible evidence. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d at 704. But even if the police report, challenged properly, would be inadmissible hearsay, it has been well-settled for at least one hundred years that hearsay testimony received without objection is to be considered and given its natural probative effect. *Sac and Fox Indians of the Mississippi in Iowa v. Sac and Fox Indians of the Mississippi in Oklahoma*, 220 U.S. 481, 488-489 (1911); *Gibson v. Elgin, J. & E. Ry. Co.*, 246 F.2d 834, 836 (7th Cir. 1957).

16

level of "actionable" sexual harassment under Title VII.[5] [DE 22 at 13; DE 24 at 12-13; DE 26 at 5]. The court is not persuaded. First, AutoZone's argument seems incorrect on its own terms. Gard and Cunningham stated that Shaw did the same thing to Driggers that he did to Wiseman. If that statement was accurate, what Shaw did to Driggers was actionable sexual harassment. Second, and more importantly, AutoZone's argument is not on point. The relevant inquiry here is not whether Shaw's actions towards Driggers were independently actionable under Title VII. Instead, the relevant inquiry is whether those actions were sufficient to put AutoZone on notice of a reasonable probability that actionable harassment would occur *in the future*, thereby triggering the employer's preventative duty. *Erickson*, 469 F.3d at 606. *Erickson* stressed that actionable harassment is not a necessary predicate, stating: "[a]n employee's effort to bring a threat of potential sexual harassment to an employer's attention . . . can, under certain circumstances, be enough to give rise to liability." 469 F.3d at 606 (citing *Frazier v. Delco Elec. Corp.*, 263 F.3d 663 (7th Cir. 2001)).

A closer look at the case law reinforces this conclusion. In *Erickson*, the Seventh Circuit left the question of whether the Wisconsin Department of Corrections was negligent in addressing the risk that a female employee would be harassed by a male prisoner to the jury. *Id*. The plaintiff complained to her supervisors that, while working alone and after hours in her office adjacent to a correctional facility, she encountered a male inmate-*cum*-janitorial-employee who stared at her in a way that made her uncomfortable. 469 F.3d at 607. Unfortunately, the plaintiff's employer took no meaningful action, and she was later sexually assaulted by the same inmate. While the inmate's

---

[5]   When the Seventh Circuit discusses whether an instance of harassment is "actionable" it uses the term as a shorthand reference to the requirement that sexual harassment be "severe" or "sufficiently pervasive to support a hostile environment claim" to provide a basis for recovery under Title VII. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000).

initial behavior may rightly strike the observer as strange and suspicious, uncomfortable stares are far from actionable sexual harassment under Title VII. The Seventh Circuit nonetheless reversed the district court's grant of summary judgment because the plaintiff's complaint about the inmate's behavior was sufficient to put the defendant on notice of a reasonable probability that harassment would occur. *Id.*; *cf. Valentine v. City of Chicago*, 452 F.3d 670, 680 (7th Cir. 2006) (plaintiff's complaint to supervisor that her eventual harasser was "aggravating [her], that he was being rude, [and] that he had put his hands on [her]" was sufficient to put employer on notice of a reasonable likelihood of harassment). Reduced to bare legal terms, the problem with AutoZone's argument is plain: Title VII's preventative purpose would not be served if actionable harassment had to occur before an employer could be considered on notice that actionable harassment might later occur.[6]

Furthermore, as the Seventh Circuit has said, "[u]nder Title VII, an employer typically draws upon two sources of information in order to determine the risk of sexual harassment to an employee: information received directly from the employee, and the employer's knowledge of the specific context of its own working environment." *Erickson*, 469 F.3d at 606. An employer's awareness of a male customer's history of sexually harassing or behaving inappropriately toward female employees undoubtedly qualifies as the sort of "knowledge of the specific context of its own working environment" that must be considered when assessing the risk of sexual harassment. There is no doubt that, in light of the foregoing authorities, a reasonable jury could conclude that Shaw's

---

[6]   Additionally, AutoZone's own policies and prior actions belie any argument that Shaw's conduct toward Driggers was insufficient to put it on notice. AutoZone's company policy defines "sexual harassment" as including "actions, comments, inappropriate physical contact, sexual advances or any other contact that is intimidating or otherwise offensive or hostile." [DE 23-5]. Surely what Shaw did to Driggers qualifies. Shaw's conduct was concerning enough that, "actionable" or not, AutoZone took action; it agreed with Driggers that she should no longer make deliveries to his shop alone.

actions towards Driggers indicated a reasonable probability that Wiseman would be sexually harassed. This is so whether the court considers those actions specifically, as delineated in the police report, or considers only Gard and Cunningham's broader statement that Shaw did the "same thing" to Driggers as he did to Wiseman.

**B.      Whether AutoZone Was Informed**

As discussed, the court has found a triable issue of whether Shaw's actions towards Driggers created a reasonable probability that harassment might occur. But despite the foregoing, AutoZone argues that it was not and reasonably could not have been aware of those actions. Were that argument correct, AutoZone's duty to take reasonable preventative steps would still not have been triggered. In support, AutoZone claims that all Cunningham and Gard knew about Driggers's problem was that Shaw sometimes tried to hug her. But Gard and Cunningham's conversation about Shaw doing the same thing to Wiseman as he did to Shari Driggers tends to undercut their professed lack of knowledge of the depth and breadth of Shaw's previous transgressions. What Shaw did to Wiseman was hardly the same thing as trying to "hug on her." [DE 23-2 at 9; DE 25-1 at 4-5]. In any case, Driggers told a police officer that Shaw did much more than that, and she stated that her superiors were "aware of the situations that had occurred." The "situations that had occurred" included instances where Driggers had her hands full of auto parts and Shaw had touched her waist and grabbed her buttocks, and an instance where he had managed to kiss her after approaching closely under the guise of whispering something. [DE 25-8]. This case is before the court on the Defendant's motion for summary judgment. Factual disputes are resolved in the Plaintiff's favor, and the court will consider AutoZone aware of the situations - all of them - that had occurred.

**C.      Reasonable Steps to Prevent that Harassment from Occurring**

19

AutoZone took action to combat the threat Shaw posed to Driggers by allowing her to refuse to deliver to Shaw's unless Shaw's female employee was present. This solution was effective, and prevented any escalation of the situation. It was discontinued, however, when Driggers left AutoZone's employ, and the parties do dispute whether any action was taken to notify Wiseman that Shaw posed a risk. AutoZone claims Cunningham warned Wiseman at the outset of her employment that if she did not feel comfortable delivering to Shaw's, she did not need to do so. But Wiseman testified at her deposition that AutoZone "didn't tell [her] anything about Shaw." [DE 25-1 at 6]. Gard's testimony confirms Wiseman's account, [DE 25-6 at 2], and Wiseman's version of events controls at summary judgment.

AutoZone's only reply is that it adopted a basic company-wide policy opposing sexual harassment. AutoZone relies on *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 507 (7th Cir. 2004) ("[w]ithout employer knowledge of the harassing conduct, the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII"). The promotion of general anti-harassment policies is *not* enough, however, when the employer *does* have knowledge of harassing conduct, or a reasonable probability that harassment will occur. *See generally Erickson*, 469 F.3d 600; *Frazier*, 263 F.3d 663; *Valentine*, 452 F.3d 670. The undisputed facts, and the disputed facts resolved in the Plaintiff's favor, show that AutoZone, despite being informed of a reasonable probability that Wiseman would be harassed, took no preventative action whatsoever. The court acknowledges that Shaw's eventual actions - in severity, not in kind - may have been more egregious than any of the parties could have reasonably foreseen. Negligence analysis does necessarily hinge on proportionality, and perhaps a warning of the type that Cunningham believes he gave to Wiseman could prove sufficient to discharge

AutoZone's duty. But Cunningham's version of events does not control on summary judgment, and the court need not decide what suite of preventative or informative actions by AutoZone would be "reasonable" in proportion to the threat posed by Mr. Shaw. It is enough to recognize that a reasonable jury could find that *no* preventative or informative action is a negligent response to *some* reasonable probability of harassment by a known entity.

For the foregoing reasons, summary judgment on Count I is **DENIED.**

### Count II: Retaliation

Wiseman's second claim is that she was retaliated against as a result of reporting the Shaw incident to her supervisors and to the police. [DE 1 ¶¶ 14-18]. The court finds that the Plaintiff has made a *prima facie* case sufficient to withstand summary judgment through the direct method of proof. Summary judgment is therefore denied.

Under Title VII it is "unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act." 42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation under the direct method of proof, a plaintiff must establish that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) there was a causal link between the adverse action and the protected activity. *Metzger v. Illinois State Police,* 519 F.3d 677, 681 (7th Cir. 2008) (citing *Dorsey v. Morgan Stanley,* 507 F.3d 624, 627 (7th Cir.2007)); *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006).  In order to prove a causal link, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996).

The Plaintiff need not rely only on direct evidence: "circumstantial evidence that is relevant

and probative on any of the elements of a direct case of retaliation may be admitted and, if proven

to the satisfaction of the trier of fact, support a case of retaliation." *Gates v. Caterpillar, Inc.*, 513

F.3d 680, 686 (7th Cir. 2008) (quoting *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781

(7th Cir. 2006). "The conventional distinction is that direct evidence is testimony by a witness about

a matter within his personal knowledge and so does not require drawing an inference from the

evidence (his testimony) to the proposition that it is offered to establish, whereas circumstantial

evidence does require drawing inferences." *Sylvester v. SOS Children's Vill. Ill. Inois, Inc.*, 453 F.3d

900, 903 (7th Cir. 2006) (citing 1 John H. Wigmore, Evidence § 25, at p. 953). There is no

meaningful difference, in terms of probative value, between the two. *Id.* (citing *Anchor v. Riverside

Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997)). Case law attempts to list the types of circumstantial

evidence the court might consider on review of a Title VII retaliation claim, *see, e.g.*, *Troupe v. May

Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (listing suspicious timing, ambiguous oral or

written statements, behavior towards other members of a protected group, tendency or statistical

evidence, or contrasts with similarly situated employees), but these lists should not be read as

exhaustive.[7] Rather, the court may and should consider *any* admissible evidence presented to it,

whether direct or circumstantial, which tends to prove or disprove an element of the Plaintiff's *prima

facie* case. Summary judgment must be denied if, taken together, that evidence is "such that a

reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

As to the first element of the *prima facie* case, AutoZone concedes that Wiseman engaged

---

[7] Nor do cases like *Troupe*, which coined the familiar phrase "convincing mosaic of
circumstantial evidence," create new standards of proof. *Sylvester*, 453 F.3d at 904.

22

in a statutorily protected activity. This is a wise concession. "A plaintiff that reports [sexual harassment] to the police clearly 'opposes' it within the meaning of 42 U.S.C. § 2000e-3(a)." *Worth v. Tyler*, 276 F.3d 249, 265 (7th Cir. 2001) (where the Seventh Circuit had "no problem" concluding that an employee who filed a police report after her superior touched her breast was engaging in a protected activity under Title VII's "opposition clause"). Wiseman's complaint to her own supervisors was likewise protected, and it makes no difference that her harasser was not an AutoZone employee. *See Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434 (7th Cir. 2010) (holding that employee complaints about harassment by non-employees are a protected activity).

As to the second element, AutoZone contests whether Ms. Wiseman suffered an adverse employment action. The court recognizes that Ms. Wiseman was subjected to many unpleasant interactions and day-to-day inconveniences - some quite severe - following her complaint and police report, but agrees with AutoZone that such mistreatment does not amount to an "adverse employment action" for Title VII purposes. "For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). Moreover, "[a] plaintiff's subjective determination of tension in the workplace, without more, cannot constitute an adverse employment action absent a tangible job consequence." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). There are only two realistic candidates for an adverse action in Ms. Wiseman's case: (1) her reassignment to the sales floor shortly after the Shaw incident; and (2) her eventual termination.

The undisputed facts show that Ms. Wiseman's reassignment was not an adverse employment action for Title VII purposes. Wiseman's responsibilities changed, but her pay,

benefits, schedule and terms of employment remained roughly the same following her lateral transfer. "An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities[,]" *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)), and "a lateral transfer without a loss of job benefits does not constitute an adverse employment action." *Stutler v. Illinois Dept. Of Corr.*, 263 F.3d 698, 702-703 (7th Cir. 2001). Nobody disputes that Wiseman was unenthusiastic about her new position, but her disposition toward the job has little bearing on this analysis. *Id.*; *Place v. Abbott Lab., Inc.*, 215 F. 3d 803, 810 (7th Cir. 2000).

Ms. Wiseman's termination, however, obviously was an adverse employment action. A "firing" is precisely the sort of "significant change in employment status" that constitutes an adverse action for Title VII purposes. *Lewis*, 496 F.3d 653. AutoZone, despite conceding repeatedly that Ms. Wiseman was terminated, seems to argue that her termination was not an adverse employment action simply because, in its view, she was terminated for cause.[8] This argument is legally misplaced. Whether or not some legitimate reason existed to justify Wiseman's termination goes towards whether this court can find a causal link between the adverse action and the protected activity (the third element). It has no bearing on whether the adverse action can or should qualify as such. Both parties acknowledge that Ms. Wiseman was, in fact, terminated; AutoZone even provided the court with its termination report. [DE 23-18]. This court sees no reason to disagree.

As to the third element, AutoZone contests whether Wiseman can show a causal link

---

[8] Reference, for example, DE 22 at 19 ("AutoZone *terminated* Wiseman's employment because it believed she had [*sic*] abandoned her job"); DE 22 at 16 ("AutoZone ultimately *terminated* her employment for job abandonment."); DE 26 at 8 (". . . her ultimate *termination* for job abandonment."); DE 23-5 at 3 ("If an AutoZoner fails to call in or report to work for 2 consecutive days . . . [her] employment is automatically *terminated*.").

between the adverse action and the protected activity. "The key inquiry in determining whether there is a causal connection under the direct method is whether [Plaintiff's supervisor] was aware of [her protected activity] at the time of [his] decisions to" take adverse action against the plaintiff; "absent such knowledge, there can be no causal link between the two." *Lucie v. Amaurotic Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). It is undisputed that Wiseman's supervisors knew of her complaint to them (obviously) and of her complaint to the police (which they spoke to her about) at the time of her termination. Beyond that, Wiseman emphasizes the temporal proximity between her complaints about sexual harassment and her termination. Depending on whether one uses the day when AutoZone stopped permitting Wiseman to work, or the day she was officially terminated, as the point of reference, Wiseman was terminated one to two months after she engaged in protected activity.

"Mere temporal proximity," without additional evidence, is not enough to withstand summary judgment under the direct method of proof. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). But it is still circumstantial evidence probative of a causal connection, and Wiseman presents much more than "mere temporal proximity." The record also contains evidence directly probative of a hostile animus on the part of her supervisors towards Wiseman engaging in the protected activity of reporting Shaw's assault to the police. When Wiseman initially complained to Gard and Cunningham, they discouraged her from filing a police report, despite the fact that a criminal offense had clearly occurred. A reasonable jury might catch a glimpse into her supervisors' motives for discouraging a police filing in the comments they made upon learning of her intent to follow through: Gard ordered her to do it on her own time, while Cunningham grumbled about losing a commercial client.

25

Viewed in light of the foregoing, the various instances of mistreatment that Wiseman complains began around the time she filed a police report and continued through her termination, while not independently sufficient to constitute adverse actions, do become more probative of a retaliatory intent. Viewed in light of the foregoing, Wiseman's termination relatively soon after her complaint, and following a period of alleged abuse that began when she engaged in a protected act, carries much more inferential weight than that of "mere proximity." It does not matter whether each of these items are classified as direct or circumstantial evidence; the probative value is the same. *Sylvester*, 453 F.3d at 903. What does matter is this: the court has no trouble whatsoever concluding that a reasonable jury confronted with all of this evidence could conclude that Wiseman would not have been discharged "but for" her decision to file a police report, and the economic impact her supervisors perceived that action having on their business.

Interestingly, Wiseman's brief concedes that, under the direct method of proof, AutoZone would still be entitled to summary judgment if it could present "unrebutted evidence that [it] would have taken the adverse employment action against the plaintiff even if [it] had no retaliatory motive[.]" *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). AutoZone's suggestion that Wiseman was fired for cause - particularly, job abandonment - is relevant here. But because the same evidence that Wiseman presents to establish a causal link between her protected act and her termination serves to contradict, or "rebut," AutoZone's assertion that she was terminated for job abandonment, the court is not persuaded that this purported legitimate reason for her firing entitles AutoZone to summary judgment.

The *Stone* language quoted by the Plaintiff is taken out of context. Ripped from that context, it seems to suggest a mistaken appropriation of indirect method pretext analysis to the direct method

paradigm. But the surrounding language in *Stone* clarifies: "If the plaintiff has produced evidence that [she] was fired *because* of [her] protected expression[,]" which Wiseman has done, "[she] has gone beyond *McDonnell Douglas* by producing actual evidence of unlawful conduct - evidence that the firing was in fact retaliation for [her] complaining about discrimination. The fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" *Id*. at 643. Simply put, there is no burden-shifting in the tradition of *McDonnell Douglas* under the direct method of proof. True, *Stone* goes on to state, "Evidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have fired plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm." *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). But, practically speaking, the *Stone* language in question amounts to little more than an acknowledgment of the obvious truth that, if a plaintiff cannot provide evidence of retaliatory intent (which would inherently contradict any nondiscriminatory reason suggested by a defendant), her case cannot withstand a motion for summary judgment. In cases like the one *sub judice*, where the Defendant's proffered reason for termination (job abandonment) *is* contradicted by evidence of retaliatory motivation, the case hinges on a pure credibility battle: which side will the fact-finder believe? Nothing could be more appropriate for a jury determination and less appropriate for resolution by this court on summary judgment.

For the foregoing reasons, summary judgment on Count II is **DENIED.**

### Count III: Pregnancy Discrimination

Wiseman's third claim is that she was discriminated against on account of her pregnancy.

[DE 1 ¶¶ 19-37]. The court finds that the Plaintiff has not established a *prima facie* case through either the direct or indirect methods of proof. Summary judgment is therefore granted.

The Pregnancy Discrimination Act amended Title VII to forbid discrimination "because of or on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k). "The PDA created no rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Serednyj v. Beverly Healthcare, LLC*, ___ F.3d ____, 2011 WL 3800123 at *4 (7th Cir. Aug. 26, 2011) (citing *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008)). "The PDA made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id*. As a result, Wiseman's claim for pregnancy discrimination is a claim for sex discrimination, and the legal analysis is the same as it would be under the traditional Title VII methods of proof. *Id*. (citing *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007)).

Wiseman does not argue the direct method of proof, but this court will consider it nonetheless. Under the direct method, the Plaintiff may show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action against her was motivated by an impermissible purpose: in this case, her pregnancy. *Serednyj*, 2011 WL 3800123 at *4 (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Adapting the three-prong version of that standard to this issue, Wiseman must establish that: (1) she was pregnant; (2) she suffered an adverse employment action subsequent to her becoming pregnant; and (3) there was a causal link between the adverse action and her pregnancy. The first two requirements are easily satisfied. It is undisputed that Wiseman was pregnant in the Spring of 2008, and the court has

previously concluded that she was terminated. Wiseman fails, however, because she has not raised a triable issue of causation.

The court is satisfied that AutoZone knew of Wiseman's pregnancy before she was terminated. *See Lucie v. Amaurotic Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (a key inquiry in causation analysis is whether the plaintiff's supervisor was aware of the plaintiff's protected status at the time an adverse action was taken). She submitted a certificate of pregnancy to her supervisors in February of 2008. But, obviously, knowledge alone does not establish causation. Wiseman's points of evidence on the "causal link" issue are similar to some of the evidence discussed in this court's consideration of her retaliation claim: (1) Wiseman was terminated relatively soon after AutoZone learned of her pregnancy (here two to three months, as opposed to one to two months after she engaged in a protected act), and (2) sometime between AutoZone learning of Wiseman's pregnancy and her eventual termination, she began to be subjected to various mistreatment and felt disfavored. But on this Count, that is the full extent of the favorable evidence.

It is useful to contrast this with Wiseman's evidence of retaliation. There, Wiseman can point to her supervisors' various expressions of hostility to her engaging in a protected act - discouraging her from filing a police report, forcing her to clock out to do so, and expressing displeasure at the economic consequences - all of which are probative of a retaliatory animus, which is *the* crucial element. No correspondingly strong evidence of a discriminatory motive on account of Wiseman's pregnancy exists. Instead, Wiseman's evidence linking her termination and her pregnancy is barely more than the sort of "mere temporal proximity" that is categorically insufficient to withstand summary judgment. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Even in light of evidence that she began to be mistreated at some point after her employer learned

29

she was pregnant, Wiseman has at best demonstrated a correlation between her pregnancy and turbulence in her relationship with AutoZone. But correlation does not establish causation, and the weight of Wiseman's evidence is further tempered by her own admission that, upon learning of her pregnancy, her coworkers' behavior toward her did not change at all until after the Shaw incident, a significant intervening event. Faced with the foregoing, a reasonable jury could not find that "but for" Wiseman's pregnancy, she would not have been terminated. *See Karzanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991) (to succeed on a Title VII discrimination claim, a plaintiff must prove that she "would not have been discharged 'but for' [her] employer's motive to discriminate against [her]"). It is simply not enough.

Wiseman's second option is to prove her *prima facie* case through the indirect, burden-shifting method. To succeed, Wiseman must show (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her job duties satisfactorily; (3) she was terminated; and (4) similarly situated, nonpregnant employees were treated more favorably. *Serednyj*, 2011 WL 3800123 at *7 (citing *Griffin*, 489 F.3d at 844). Each of the four elements under the indirect method of proof can be proven with direct or circumstantial evidence. *Desert Palace, Inc., v. Costa*, 539 U.S. 90, 91 (2003). Once a plaintiff sets forth a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for terminating her. *Serednyj*, 2011 WL 3800123 at *7. If such a reason is advanced, the plaintiff can survive summary judgment only by showing that the defendant's reason was a pretext for intentional discrimination. *Id.*

Pretext analysis is unnecessary here because the Plaintiff has not made a *prima facie* case. Specifically, the Plaintiff has not shown that similarly situated employees were treated more favorably. "Employees are similarly situated if they are directly comparable in all material aspects."

30

*Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). This is not a simple inquiry. The factors relevant to this standard depend on the context; in disciplinary cases, for example, a plaintiff must show that she is "similarly situated with respect to performance, qualifications, and conduct." *Thompson v. John J. Madden Mental Health Ctr.*, 35 Fed. Appx. 413, 414 (7th Cir. 2002) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th cir. 2000)). Wiseman has not even attempted to identify specific similarly situated employees, to show how those employees were similarly situated, or to show how AutoZone treated those employees more favorably. All Wiseman has provided to the court is this:

> In his deposition, Lucas Gard, the store manager at the time of the incident, stated that he is aware of the policy for granting an accommodation and has done so in the past.

[DE 24 at 23].

Gard did state that. But Wiseman has given the court nothing at all on which to base an analysis. Who are these people? Was their experience commensurate with that of the Plaintiff? What about their qualifications, performance and conduct? Does *anything* render these persons similarly situated to Nicolette Wiseman? What does granting an "accommodation" have to do with anything? Wiseman may have answers to these questions, but she has not presented them to the court, and the court has not been able to find them in the record. Nor should it have had to try. While the court does bear responsibility to determine if genuine issues of material fact exist, "[t]he parties bear a concomitant burden to identify the evidence that will facilitate this assessment." *Jordan v. Cent. Rest. Prod.*, 2008 WL 4858395 at *4 (S.D.Ind. November 7, 2008) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). "Judges are not like pigs, hunting for truffles buried in briefs." *Id.* (quoting *United States v. Dunkel*, 927 F.3d 955, 956 (7th Cir. 1991)). Wiseman

has completely failed to carry her burden in this respect.

For the foregoing reasons, summary judgment on Count III is **GRANTED**.

### Count IV: Negligence

Wiseman brings a fourth claim of negligence under state law. [DE 1 ¶¶ 38-41]. AutoZone requests summary judgment on the grounds that a negligence claim is barred by the exclusivity provision of the Indiana Workmen's Compensation Act. The court agrees that the claim is barred, but finds that summary judgment is not the appropriate remedy. The exclusivity provision of the Indiana Workmen's Compensation Act creates a defect of subject matter jurisdiction, rather than a defect of the Plaintiff's substantive case. *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 466 (7th Cir. 1990). Dismissal is the proper resolution, *id.*, and the court dismisses Count IV with prejudice.

The Indiana Workmen's Compensation Act, Ind. Code § 22-3-2-6, states in relevant part: "The rights and remedies granted to an employee subject to [Ind. Code §] 22-3-2 through [Ind. Code §] 22-3-6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee[.]" In support of its position, AutoZone cites the Seventh Circuit:

> [The] Indiana's Workmen's Compensation Law [makes] workmen's compensation the exclusive remedy for injuries, physical or mental, arising out of the employment relationship. Ind. Code § 22-3-2-6. We need not leave this to inference. *Fields v. Cummins Employees Federal Credit Union,* 540 N.E.2d 631, 635-36 (Ind. Ct. App. 1989), holds that a claim under Indiana law against an employer for sexual harassment by a coworker of the plaintiff is within the exclusive jurisdiction of the workmen's compensation law, which provides an administrative remedy not litigable in federal court under either the pendent or the diversity jurisdiction of the federal courts. *Begay v. Kerr-McGee Corp.,* 682 F.2d 1311, 1317-19 (9th Cir. 1982); *Trembath v. St. Regis Paper Co.,* 753 F.2d 603, 605-06 (7th Cir. 1985); *Wolfe v. Commercial Union Ins.,* 792 F.2d 87, 91 (7th Cir. 1986); *Beach v. Owens-Corning Fiberglas Corp.,* 728 F.2d 407, 409 (7th Cir. 1984).

*Guess*, 913 F.2d at 466. In support of her argument that her claim is not barred, Wiseman cites a footnote from *Schele v. Porter Memorial Hospital*:

> As the Plaintiff has indicated, this case does not involve personal injuries by accident. *See Hurd v. Monsanto Co.*, 908 F.Supp. 604, 608, 609-610 (S.D.Ind. 1995). Courts have recognized that the exclusivity provision does not bar an assortment of claims. *See, e.g., McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1166 (7th Cir.1997) (intentional infliction of emotional distress); *Tacket v. GMC,* 93 F.3d 332, 335 (7th Cir.1996) (emotional ); *Van Jelgerhuis v. Mercury Fin. Co.,* 940 F.Supp. 1344, 1368 (S.D.Ind.1996) (sexual harassment); *Perry v. Stitzer Buick GMC, Inc.,* 637 N.E.2d 1282, 1288–89 (Ind. 1994) (racial harassment and claims for injuries that were not physical); *Coble v. Joseph Motors, Inc.,* 695 N.E.2d 129, 134 (Ind. Ct. App. 1998) (intentional tort). For these reasons, the Court finds that the Plaintiff's state law claims are not barred by the exclusivity provision of the Indiana Worker's Compensation Act.

198 F.Supp.2d 979, 993 n.11 (N.D.Ind. 2001). Wiseman reads *Schele* as exempting her claim, and others like it, from the exclusivity provision because she does not exclusively claim damages from physical injuries. [DE 24 at 24]. But the *Schele* footnote is best read as a simple acknowledgment that the operation of the exclusivity provision is not automatic. Rather, rights and remedies of an employee against her employer for personal injuries are only excluded "where those injuries are (1) by accident; (2) arising out of employment; and (3) arising in the course of employment." *Van Jelgerhuis v. Mercury Fin. Co.,* 940 F.Supp. 1344, 1366 (S.D.Ind.1996). The requirement that the plaintiff's injuries arise "by accident" obviously exempts intentional tort claims from the operation of the exclusivity provision. But Wiseman's claim is in negligence - not intentional tort - and AutoZone's knowledge of the risk posed by Shaw does not alter the analysis: "[t]he mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent." *Id*. at 1367 (quoting *National Can Corp. v. Jovanovich*, 503 N.E.2d 1224, 1233 (Ind. Ct. App. 1987)).

33

Moreover, one aspect of the law in this area is exceptionally consistent: a negligence claim under Indiana law by an employee against an employer for sexual harassment is within the exclusive jurisdiction of Indiana's Workmen's Compensation Act. *See Guess*, 913 F.2d at 466; *Arrow Unif. Rental, Inc. v. Suter*, 545 N.E.2d 832 (Ind. Ct. App. 1989) (employee's negligence action against employer for sexual assault perpetrated by co-employees was barred by exclusivity provision of Workmen's Compensation Act); *Fields v. Cummins Emp. Fed. Credit Union,* 540 N.E.2d 631, 635-636 (Ind. Ct. App. 1989) (holding that a claim under Indiana law against an employer for sexual harassment by a coworker of the plaintiff is within the exclusive jurisdiction of the workmen's compensation law). Even *Van Jelgerhuis,* 940 F.Supp. 1344, which *Schele* cites as supportive of the proposition that some sexual harassment claims are exempt from the operation of the exclusionary provision, is no help to Wiseman's case. In *Van Jelgerhuis*, the plaintiff sought state law tort remedies for sexual harassment by a co-worker against both her employer (Mercury) and the former employee who had harassed her. The Southern District Court found that the claims against the plaintiff's *employer* were "within the exclusive province" of Indiana's Workmen's Compensation Act. 940 F.Supp. at 1367-1368. It is only the claims against the *employee* which were exempted. *Id.* The claim at issue in this case is not leveled at Shaw in intentional tort. It is leveled directly at AutoZone, Wiseman's employer, in negligence, and is based solely on sexual harassment [DE 1 ¶ 38]. As the Seventh Circuit has squarely held, "a claim under Indiana law against an employer for sexual harassment by a coworker of the plaintiff is within the exclusive jurisdiction of the workmen's compensation law." *Guess*, 913 F.2d at 466. The court finds no reason in the case law to depart from this Circuit's established rule.

For the foregoing reasons, Count IV is **DISMISSED** with prejudice.

34

## IV.  CONCLUSION

To reiterate one final time, for the reasons stated herein, summary judgment is granted in part and denied in part. Summary judgment is **DENIED** on Count I and **DENIED** on Count II. Summary judgment is **GRANTED** on Count III, and Count IV is **DISMISSED** with prejudice for an incurable lack of subject matter jurisdiction.

**SO ORDERED.**

**DATED: September 26, 2011**

    /s/ Jon E. DeGuilio
**JON E. DEGUILIO, JUDGE**
**UNITED STATES DISTRICT COURT**